IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PAUL E. HYDE,

        Petitioner,                    No. CIV S-08-1365-FCD-TJB

      vs.

STEVE MOORE,

        Respondent.              FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Paul E. Hyde is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that habeas relief be denied.

## II.  PROCEDURAL HISTORY

Petitioner is currently serving a sentence of seven years to life.  Pet'r's Pet. 1, ECF No. 1. "In 1973, at age 19, in the Los Angeles County Superior Court case No. A068239, [Petitioner] was convicted of first degree murder (§ 187; count 5), four counts of robbery of the first degree (§ 211; counts 1, 2, 6 & 7), assault with a deadly weapon with the intent to commit murder (former § 217; count 3), and assault by means of force likely to produce great bodily injury and with a deadly weapon (§ 245, subd. (a)(1); count 4), each with the personal use of a firearm (§

1

1    12022.5)." *In re Hyde*, 154 Cal. App. 4th 1200, 1202, 65 Cal. Rptr. 3d 162 (2007).  In the instant
2    action, Petitioner challenges the decision by the California Board of Parole Hearings (the
3    "Board") denying Petitioner parole.  Petitioner appeared before the Board on November 9, 2005.

4         On February 3, 2006, Petitioner filed a petition for writ of habeas corpus with the Los
5    Angeles County Superior Court challenging the Board's decision.  *See* Resp't's Answer Ex. A,
6    pt. 1, at 6-149, ECF No. 13.

7         On January 3, 2007, the Superior Court granted habeas relief.  *See* Resp't's Answer Ex.
8    A, pt. 2, at 139-40.  The Superior Court found "that petitioner's continual parole denials have
9    been based mainly on the gravity of the commitment offense, the circumstances of which can
10   never change."  *Id.* at 140.  The Superior Court reasoned that "[a]fter more than three decades of
11   incarceration, reliance upon such unchanging circumstances violates due process because these
12   immutable circumstances become unreliable predictors of petitioner's dangerousness such that
13   they can no longer fulfill the 'some evidence' standard."  *Id.* at 139.  Accordingly, the Superior
14   Court determined "there is no evidence that petitioner's release on parole unreasonably
15   endangers the public."  *Id.*

16        Additionally, the Superior Court recognized that Petitioner "has been discipline free for
17   14 years and a 2005 psychological report indicates that petitioner's 'dangerousness . . . if released
18   into the community is significantly below average in comparison with other inmates."  *Id.*  The
19   Superior Court also pointed out that while the Board must consider "that the district attorney
20   opposed parole[,] . . . that opposition is not a factor on which the Board may rely to deny parole."
21   *Id.* at 140 (citation omitted).  The Superior Court decided that "the Board's continued reliance on
22   unchanging factors will essentially convert petitioner's original sentence to life with the
23   possibility of parole into a sentence of life without the possibility of parole," and "Petitioner has
24   no chance of obtaining parole unless the Board holds that his crime was not serious enough to
25   warrant a denial of parole."  *Id.*

26        On February 2, 2007, Respondent filed a notice of appeal in the California Court of

1    Appeal, Second Appellate District. *Id.* at 141-42.

2        On August 7, 2007, the Court of Appeal reversed the Superior Court's decision. *In re*

3    *Hyde*, 154 Cal. App. 4th at 1218, 65 Cal. Rptr. 3d 162. The Court of Appeal found that

4    Petitioner's "crimes are collectively so grave that we cannot find their remoteness has resulted in

5    a loss of reliability as predictors of future dangerousness." *Id.* at 1216, 65 Cal. Rptr. 3d 162. The

6    Court of Appeal elaborated that even if the "1972 to 1973 offenses were too remote in time to be

7    reliable, the superior court here also erred because it failed to consider [Petitioner's] 1990

8    conviction" for "possession of a piece of aluminum that he had fashioned into [a] 15-inch

9    stabbing instrument . . . ." *Id.* The Court of Appeal thereby concluded that "[t]he 1990 offense

10   renders the 1973 offenses considerably more probative in supporting a conclusion of an

11   unreasonable risk of danger to society than if the 1972 to 1973 offenses are considered in

12   isolation." *Id.* at 1217, 65 Cal. Rptr. 3d 162.

13       On October 9, 2007, Petitioner sought relief in the California Supreme Court, which

14   denied the petition without a written opinion on December 12, 2007. *See* Resp't's Answer Exs.

15   F-G.

16       On June 17, 2008, Petitioner filed the instant federal petition for writ of habeas corpus.

17   Respondent filed an answer to the petition on October 10, 2008, to which Petitioner filed a

18   traverse on October 22, 2008.[1]

19                          III.  FACTUAL BACKGROUND

20       A.  Commitment Offenses

21           In December 1972 and January 1973, at age 18, [Petitioner] had
             moved away from his parents' Los Angeles residence after a

22

23       [1] On January 28, 2009, Petitioner filed an amended petition challenging his parole denial
     at his April 19, 2007 hearing. *See* Pet'r's Am. Pet. 87, ECF No. 15. On November 20, 2009, an

24   order was issued by the Honorable Edmund F. Brennan, acknowledging that the "June 17, 2008
     petition challenges a 2005 Board of Parole Hearings decision, while the January 28, 2009

25   petition challenges a 2007 Board of Parole Hearings decision." Order 1, Nov. 20, 2009, ECF No.
     19. The Clerk of the Court was directed to open a new action for the January 28, 2009 petition,

26   *id.* at 2, which the Clerk did under No. 2:09-cv-03240-FCD-KJN.

                                        3

quarrel and rented an apartment in Santa Monica. During these months, he went on a robbery spree with a firearm. He preyed on at least four local businesses and their employees or owners in order to obtain the funds he needed to pay his living expenses. There were two victims during the robbery of Bill's Bike Shop, and during that robbery, at gunpoint, [Petitioner] threatened to kill the husband/owner if the wife/owner did not remain in the bathroom. During the robbery of the Red Ball gas station, for no apparent reason, [Petitioner] shot the unresisting female employee in the back with a through-and-through shot, causing her to fall. Then, he shot her again in the thigh while she lay on the floor. The second bullet lodged in her groin. Later, he fatally shot a 63-year-old shoe repair business owner in the chest and abdomen. [Petitioner] apparently was not charged with a robbery in connection with the murder as it was not entirely clear whether he had robbed the victim. Then, during two successive later robberies, [Petitioner] used a gun, confronting two employees in one robbery, and confronting one employee in the other. In total, [Petitioner] obtained less than $ 250 during the robbery spree.[2]

*In re Hyde*, 154 Cal. App. 4th at 1203-04, 65 Cal. Rptr. 3d 162.

At the hearing, Petitioner's counsel stated:

[Petitioner will] be happy to discuss the post-condition factors involved and parole plans. We respectfully decline to discuss the commitment offense. We're satisfied that the record previously made on the eight previous hearings is satisfactory and an adequate record. So, he's accepted his responsibility and (indiscernible)[.]

Resp't's Answer Ex. A, pt. 1, at 53; Parole Hr'g Tr. 9.

Accordingly, the Board read from the "board report of [the] November 2003 calendar" when addressing Petitioner's remorse. Resp't's Answer Ex. A, pt. 1, at 54; Parole Hr'g Tr. 10, Nov. 9, 2005. The report stated Petitioner "accepts responsibility for the robberies at the businesses." Resp't's Answer Ex. A, pt. 1, at 59; Parole Hr'g Tr. 15. The report noted Petitioner "attributes his actions to the fact that he had recently quarreled with his family, left home, moved to the Santa Monica area, and was having difficulty finding a steady job and was too proud to

---

[2] These facts are from the California Court of Appeal opinion, filed on August 7, 2007. *In re Hyde*, 154 Cal. App. 4th at 1203-04, 65 Cal. Rptr. 3d 162. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

4

1   return home." Resp't's Answer Ex. A, pt. 1, at 59; Parole Hr'g Tr. 15.  In the report, Petitioner

2   alleged "he attempted to solve his problems by engaging in criminal conduct," and at that time,

3   "he was not concerned about his victims." Resp't's Answer Ex. A, pt. 1, at 59-60; Parole Hr'g

4   Tr. 15-16.  However, "[n]ow [Petitioner] can understand how they must have felt and has

5   expressed remorse for his actions." Resp't's Answer Ex. A, pt. 1, at 60; Parole Hr'g Tr. 16.

6        The report also stated that Petitioner asserted both shootings were accidental.  For the

7   shoe repair victim, Petitioner "accepts total responsibility for the death of the victim, [and]

8   regrets that the incident occurred." Resp't's Answer Ex. A, pt. 1, at 55; Parole Hr'g Tr. 11.

9   Petitioner, however, claimed "he did not enter the store" to rob the victim.  Resp't's Answer Ex.

10  A, pt. 1, at 55; Parole Hr'g Tr. 11.  Rather, according to Petitioner, "he was trying to get away

11  from some local youths who were pursuing him." Resp't's Answer Ex. A, pt. 1, at 55; Parole

12  Hr'g Tr. 11.  "The victim startled him and he fired, . . . and never robbed him." Resp't's Answer

13  Ex. A, pt. 1, at 55; Parole Hr'g Tr. 11.  Petitioner left the premises immediately and "made no

14  attempt to aid the victim." Resp't's Answer Ex. A, pt. 1, at 55; Parole Hr'g Tr. 11.

15       Likewise, in the report, Petitioner asserted that "shooting the female victim was an

16  accident." Resp't's Answer Ex. A, pt. 1, at 60; Parole Hr'g Tr. 16.  Petitioner stated "he was

17  holding back the hammer of the gun when he was startled, the gun slipped and went off and he

18  did not know [the female victim] had been shot." Resp't's Answer Ex. A, pt. 1, at 60; Parole

19  Hr'g Tr. 16.  Petitioner "heard her whimpering and thought she was only pregnant." Resp't's

20  Answer Ex. A, pt. 1, at 60; Parole Hr'g Tr. 16.  Petitioner "attempted to pull the hammer back

21  again because he thought this was the way he was supposed to handle a gun." Resp't's Answer

22  Ex. A, pt. 1, at 60; Parole Hr'g Tr. 16.  Petitioner alleged "he did not [know] she was hurt, but if

23  he had he would have helped her." Resp't's Answer Ex. A, pt. 1, at 60; Parole Hr'g Tr. 16.

24       When the Board asked Petitioner "what made [him] decide to slow down" so that his

25  prison disciplinary record was "clean for 14 years," Petitioner eventually provided some insight

26  into the commitment offenses.  Resp't's Answer Ex. A, pt. 1, at 84-85; Parole Hr'g Tr. 40-41.

Petitioner first answered, "Some people in here, they're [sic] whole world is creating conflict . . . . [A]t some point you just have to grow up, if you ever want to get out of this place."  Resp't's Answer Ex. A, pt. 1, at 85; Parole Hr'g Tr. 41.  Petitioner elaborated:

> [Y]ou see things around you and you think "that's disgusting" but when you think about it, that's you too. . . . So if you don't want to be disgusting or if you don't want to hurt people or do things, be part of the chaos, then you gotta change your activities.  You can't wait for somebody else to do it, and you can't blame somebody else.  One of the biggest mistakes I made when I came in here was thinking that everything that happened to me was somebody else's fault, and that I bore no responsibility for it.  The gentleman I was living with, for example, Larry Moss, . . . was the one who introduced me to crime in the first place.  I initially blamed him for what I did.  All he did was introduce me to it.  It was me who made the decision to do these things.  And I had to understand that and I had to accept responsibility for that.  I can show you anything, it's up to you whether or not you accept it.  And that's what happened with me.  I just had to stand up and be a man and accept responsibility for my actions.

Resp't's Answer Ex. A, pt. 1, at 90-91; Parole Hr'g Tr. 46-47.

### B.  Petitioner's Background

Petitioner's "minimum parole date was January 13, 1980."  *In re Hyde*, 154 Cal. App. 4th at 1204, 65 Cal. Rptr. 3d 162.  Prior to the November 9, 2005 hearing, Petitioner was found unsuitable for parole nineteen times.  *Id.*  "The record fails to disclose the reasons for the earlier findings of unsuitability, except that at the prior April 15, 2004, suitability hearing, the presiding commissioner had commented that apart from the gravity of the offense, [Petitioner] had 'not sufficiently participated in beneficial self-help at this time.'"  *Id.*

#### 1.  Social History

Petitioner is the third of six children.  *See* Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.  Petitioner's father "was a veteran of World War II" and was disabled.  Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.  Petitioner's mother described his father "as a paranoid schizophrenic" who "received 100 percent disability compensation from the government."  Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.  According to Petitioner,

6

his father died on September 2, 1979 of lung disease.  Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.  Petitioner's mother "worked steadily until 1969," when she left her job "at the terminal annex post office for what [Petitioner] describes as a nervous breakdown."  Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.  At the time of the hearing, Petitioner was "still very close to his mother and maintains contact via visits, letters and phone calls."  Resp't's Answer Ex. A, pt. 1, at 62; Parole Hr'g Tr. 18.

Petitioner added "that the family remains very supportive of him."  Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  According to Petitioner, he was the "only person in the family who has ever been arrested."  Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  At the time of the hearing, one brother was a "computer technician;" another was a "federal marshall [sic];" and one other was a "dean of a computer college in Virginia."  Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  "One sister is a bank officer and the other is a manager of a department store."  Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  Petitioner's family wrote letters in support of his release, including offers of residence and jobs.  Resp't's Answer Ex. A, pt. 1, at 68-74; Parole Hr'g Tr. 24-30.

Petitioner was unmarried at the time of the offense, but was married twice since his incarceration.  Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21.  On August 10, 1977, Petitioner married Ramona McCann, who he met through another inmate.  Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21; *see* Resp't's Answer Ex. A, pt. 1, at 121.  On December 28, 1982, they divorced because, according to Petitioner, "she could not handle being married to a life prisoner."  Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21.  "No children were born to this union."  Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21.  On January 24, 1983, Petitioner married Theresa Gossaway, another inmate's sister.[3]  Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21.  They had one child, Bridget, who was approximately twenty-four years

---

[3] Petitioner met his current wife in 1981, and they "were friends before the relationship became serious."  Resp't's Answer Ex. A, pt. 1, at 121 (internal quotation marks omitted).

old at the time of the hearing, and two grandchildren.  Resp't's Answer Ex. A, pt. 1, at 65; Parole

Hr'g Tr. 21.  Petitioner's current wife also had two younger children from another relationship.

Resp't's Answer Ex. A, pt. 1, at 65; Parole Hr'g Tr. 21.  Petitioner maintains contact with his

current wife, their daughter, and their grandchildren.  Resp't's Answer Ex. A, pt. 1, at 65-66;

Parole Hr'g Tr. 21-22.

### 2.  Education, Self-Help Programming, and Vocational Training

The Court of Appeal noted that Petitioner "appears to have participated in every available

educational and self-improvement class or activity available to him."  *In re Hyde*, 154 Cal. App.

4th at 1205, 65 Cal. Rptr. 3d 162.  Prior to incarceration, Petitioner "completed the 12th grade,

but did not receive a diploma because he was five units short of the requirement to graduate."

Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  While in prison, Petitioner "received his

high school diploma in 1975."  Resp't's Answer Ex. A, pt. 1, at 63; Parole Hr'g Tr. 19.  At the

time of the hearing, Petitioner had sixty-two or sixty-three college credits.  Resp't's Answer Ex.

A, pt. 1, at 63; Parole Hr'g Tr. 19.  To obtain his degree, Petitioner needed to complete an

algebra class in which Petitioner was enrolled.  Resp't's Answer Ex. A, pt. 1, at 64; Parole Hr'g

Tr. 20.

The record shows that Petitioner's self-programming was extensive.  The Board

recounted, among others:

> "March 2005, certificates of accomplishment for completing Know
> Thyself, March 2005 certificates re: participation in correctional
> network programs during the last month of March, okay.
>
> . . . .
>
> Certificate of Completion, March 19, 2005.  It's an eight week
> class for marriage enrichment.
>
> . . . .
>
> March 25, 2005[,] completing a personal purity course offered by
> the Protestant Chapel; March 27, 2007[,] a laudatory chrono
> written by an officer of the staff recommending you for your job
> well done, your work.  April 2005, participation in two additional

8

correctional network learning programs during the month of April. Certificate of accomplishment for completing anger management in 2005.  April 2nd, 2005, reflecting successful completion of ethics and values course offered by the parole facilities in connection with program management.

. . . .

May 14th, 2005, reflects another ethics and values course offered by the parole . . . .  May 2005, five correctional learning network programs during the month of June.  Another, May 2005 certificate of accomplishment for completing the stress management.  June 25, 2005, . . . a laudatory certificate of appreciation for being involved in the . . . northern African event[.]

. . . .

July 1st, 2005, completed 11 correctional learning network [programs] during the month of April and June quarter.  July 5 certificate reflects the participation of nine correctional learning network programs.  July 2005, a 128B African-American History Committee at DVI, honoring you for utilizing educational opportunities available to you.  July 2005[,] certificate of accomplishment for completing a nine hour curriculum systems course.  September of 2005[,] completion of lab respect course offered by the Family Relations and Educational Enrichment Program.

. . . .

[T]he victim's awareness program completion [is] . . . dated September 2005.  This is offered through the Correctional Learning Effort Program.

Resp't's Answer Ex. A, pt. 1, at 78-81; Parole Hr'g Tr. 34-37.

The record also reflects that Petitioner's vocational training in prison appears to be

exceptional.[4]  In 2000, Petitioner had "entry level and advanced computer repair program

---

[4] In Petitioner's closing argument, Petitioner also read reviews received during his vocational training.  In 1981, Petitioner was the "lead man for both the utility and the cleanup crew" in the "kitchen area."  Resp't's Answer Ex. A, pt. 1, at 104; Parole Hr'g Tr. 60.  Petitioner "never seem[ed] to tire of working and [wa]s always willing to do any job asked of him."  Resp't's Answer Ex. A, pt. 1, at 104; Parole Hr'g Tr. 60.  He also "devote[d] his off work time to study."  Resp't's Answer Ex. A, pt. 1, at 104; Parole Hr'g Tr. 60.  In 1984, Petitioner "performed as a recreational aide, yard orderly, culinary worker, tier orderly," and clerical worker as the Mens' Advisory Council (MAC) chairman.  Resp't's Answer Ex. A, pt. 1, at 105; Parole Hr'g Tr. 61.  As a MAC chairman, Petitioner "submitted several proposals for new job positions" and

1   completion." Resp't's Answer Ex. A, pt. 1, at 76; Parole Hr'g Tr. 32.  In 2002, Petitioner

2   "transitioned to Prison Industries Authority (PIA).  He began in the Wood Shop . . . ." Resp't's

3   Answer Ex. A, pt. 1, at 122.  In 2004, Petitioner created and organized a breast cancer walkathon,

4   in which Petitioner walked thirty-one miles.  Resp't's Answer Ex. A, pt. 1, at 106; Parole Hr'g

5   Tr. 62.  The walkathon raised $5000.  Resp't's Answer Ex. A, pt. 1, at 106; Parole Hr'g Tr. 62.

6   Petitioner also received a certificate of proficiency, dated March 18, 2005, for "[p]ainting,

7   straight, fibercoat, finish.  Number of hours is 1792 hours plus." Resp't's Answer Ex. A, pt. 1, at

8   81; Parole Hr'g Tr. 37.  In November 2005, Petitioner had "certificates of appreciation for

9   completing the training on set finish spray techniques, spray techniques washer unit, powder

10  coating techniques, spray gun maintenance use." Resp't's Answer Ex. A, pt. 1, at 76; Parole

11  Hr'g Tr. 32.

12      At the time of the hearing, Petitioner was "working for the paint shop as a lead man" for

13  which he was paid.  Resp't's Answer Ex. A, pt. 1, at 75-76; Parole Hr'g Tr. 31-32.  David Quaid,

14  the Prison Industries Administrator, wrote, "[A]fter completing all areas of his training program

15  that . . . may be awarded . . . in the paint shop area," Petitioner's "skills can assist him on finding

16  employment upon release and is coordinated with the PIA Inmate Placement Program.

17  [Petitioner] developed this program, we are using it as a model in other shops in our factory to

18

19  "even requested extra work to remain busy." Resp't's Answer Ex. A, pt. 1, at 105; Parole Hr'g
    Tr. 61.  "[N]ot a single shot had been fired since [Petitioner's] appointment to the MAC

20  committee . . . ." Resp't's Answer Ex. A, pt. 1, at 106; Parole Hr'g Tr. 62.

21      In 1991, Petitioner worked "as an industrial artist and craftsperson." Resp't's Answer Ex.
    A, pt. 1, at 104; Parole Hr'g Tr. 60.  The instructor was "somewhat skeptical about hiring this

22  inmate because he did not know the content of the program." Resp't's Answer Ex. A, pt. 1, at
    104-05; Parole Hr'g Tr. 60-61.  However, the following day, Petitioner "returned, knowing the

23  full content and operational structures, methods, course, objectives and safety procure." Resp't's
    Answer Ex. A, pt. 1, at 105; Parole Hr'g Tr. 61.  Since then, Petitioner "has re-written the course

24  outline" and lesson plans.  Resp't's Answer Ex. A, pt. 1, at 105; Parole Hr'g Tr. 61.  On July 22,
    1997, Petitioner "attended vocational electronics classes" and "completed the program in a mere

25  47 days.  This program normally requires 1200 hours or a year to complete." Resp't's Answer
    Ex. A, pt. 1, at 101; Parole Hr'g Tr. 57.  Petitioner also "helped create materials for the literacy

26  and mathematics program." Resp't's Answer Ex. A, pt. 1, at 101; Parole Hr'g Tr. 57.

develop additional painting programs." Resp't's Answer Ex. A, pt. 1, at 80; Parole Hr'g Tr. 36. Petitioner was also "involved in the Cal OSHA safety implementation in the institution," and was "part of the committee" that met "on the first Wednesday of each month." Resp't's Answer Ex. A, pt. 1, at 76-77; Parole Hr'g Tr. 32-33.

Petitioner was "confident" he could obtain employment in the computer field. Resp't's Answer Ex. A, pt. 1, at 68; Parole Hr'g Tr. 24. Petitioner also possessed "plumbing, electronics, glazing and painting skills." Resp't's Answer Ex. A, pt. 1, at 68; Parole Hr'g Tr. 24. "His job rating reports from the staff are exceptional, and the staff said that he is courteous to all, hard-working, and a stabilizing factor in the prison population." *In re Hyde*, 154 Cal. App. 4th at 1205, 65 Cal. Rptr. 3d 162; *see* Resp't's Answer Ex. A, pt. 1, at 75, 100-06; Parole Hr'g Tr. 31, 56-62. At the hearing, the Board recognized Petitioner "received several offers last year which currently remain available." Resp't's Answer Ex. A, pt. 1, at 24; Parole Hr'g Tr. 68.

### 3. Prior Criminal History

Petitioner "had no prior criminal history" before the commitment offenses. *In re Hyde*, 154 Cal. App. 4th at 1204, 65 Cal. Rptr. 3d 162. In 1971, a petition alleging grand theft was filed against Petitioner in the juvenile court. *Id.* at 1204 n.1, 65 Cal. Rptr. 3d 162. "The victim, another teenager, eventually admitted that she made the complaint because she had spent her mother's money without permission." *Id.* The victim acknowledged making up the story "to cover up her own wrongdoing, and the juvenile court dismissed the petition." *Id.*

### 4. Prison Disciplinary History

A 115 violation indicates a serious rules violation. Cal. Code Regs. tit. 15, § 3312(a)(3) ("When misconduct is believed to be a violation of law or is *not minor* in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report." (emphasis added)). While

///
///
///

incarcerated, Petitioner received fourteen 115 violations from 1977, "the last being in 1991."[5]

Resp't's Answer Ex. A, pt. 1, at 81; Parole Hr'g Tr. 37; *see In re Hyde*, 154 Cal. App. 4th at

1205, 65 Cal. Rptr. 3d 162.  From mid 1977 through 1980, Petitioner received nine of those

fourteen 115 violations.  Resp't's Answer Ex. A, pt. 1, at 122.  From 1985 to 1986, Petitioner

received three of those fourteen 115 violations.  *Id.*  Petitioner explained he "was running a '2 for

1 Store,'" and several people owed him money.  *Id.*  According to Petitioner, those people "made

reports against [him] as retaliation to avoid repayment."  *Id.* at 122-23.

On September 4, 1989, Petitioner received his thirteenth 115 violation for possession of

an inmate manufactured weapon.  *Id.* at 123.  At the hearing, the Board read the following from

the November 2003 Board report:

> Additional commitment for the manufacture and sale of a weapon,
> Solano County Case Number C28580, a prison offense two terms
> to run concurrent with the Life Term.  On 9/4/1989 at
> approximately 11:25 a.m. at a California medical facility
> Correctional Peace Officer Tidwell observed [Petitioner]
> attempting to leave H1 housing.  Officer Tidwell proceeded
> towards [Petitioner] to observe an inmate-manufactured weapon in
> his right hand.  Officer Tidwell [activated her] personal emergency
> alarm and, with the aid of responding staff, [Petitioner was stopped
> on the first floor corridor].  Officer Greenfield talked [Petitioner]
> into relinquishing the weapon to him.  Officer Greenfield passed
> the weapon over to Correctional Sergeant Hancock.  [Petitioner]
> was placed in mechanical restraints and taken to administrative
> segregation.  The inmate-manufactured weapon was aluminum.  It
> was later measured as approximately 15 and ½ inches in length,
> one inch width, sharpened [o]n one end with five inches [o]n the
> other end wrapped in masking tape, forming a handle.  The case
> was referred to the district attorney's office for prosecution.
> [Petitioner] was also found guilty at the institutional level on 3/2 of
> 1990.  He was endorsed by the staff for a ten month [SHU]
> [T]erm[], and on 8/31 of 1990 endorsed for an [indeterminate SHU
> at PBSP due to Petitioner's history of SHU placement and
> continual negative behavior].  [Petitioner's] version stated that he

---

[5] Petitioner's 115 violations listed in his 2003 Board report were:  "Disrespect, Running
from an officer when ordered to stop[,] Refusing to work, Threatening a C/O, Throwing a food
tray in the dining hall, Rights and Respect[] of others, Conduct, Deliberately Spitting on inmate
Tafua, Conduct That Could Lead to Violence, Force and Violence, Threatening an[d] Pressuring
other inmates, Inciting others to Use Force or Violence against PC inmates, Possession of an
Inmate Manufactured Weapon, Physical Altercation/Fighting."  Resp't's Ex. A, pt. 1, at 138.

1    purposely [displayed the weapon] to draw [the] staff's attention to
2    problems which were occurring at CMF.

3    Resp't's Answer Ex. A, pt. 1, at 60-61; Parole Hr'g Tr. 16-17; *see* Resp't's Answer Ex. A, pt. 1,

4    at 136.

5         On June 26, 1991, Petitioner received his fourteenth 115 violation for physical altercation

6    with another inmate.  Resp't's Answer Ex. A, pt. 1, at 123.  Petitioner fought with his cell mate

7    because his cell mate "was making sexual advances."  *Id.* (internal quotation marks omitted).

8         Additionally, a 128 violation indicates minor misconduct.  CAL. CODE REGS. tit. 15, §

9    3312(a)(2) ("When similar *minor misconduct* recurs after verbal counseling or if documentation

10   of *minor misconduct* is needed, a description of the misconduct and counseling provided shall be

11   documented on a CDC Form 128-A, Custodial Counseling Chrono." (emphasis added)).

12   Petitioner received ten 128 violations from 1977, "the last being [in] 1995."  Resp't's Answer

13   Ex. A, pt. 1, at 81; Parole Hr'g Tr. 37.  Petitioner's 128 violations listed in his 2003 Board report

14   were:  "Verbal altercation with Sergeant, Canteen procedures, CDC 115 reduced to 128A for

15   Possession of Money, Phone Procedures, Contraband, Conduct, Disruptive behavior Curtain."

16   Resp't's Ex. A, pt. 1, at 138.

17                  5.   October 12, 2005 Psychological Report

18        At the hearing, the Board also reviewed Petitioner's most recent psychological report by

19   Dr. Patricia Miller, dated October 12, 2005.  Dr. Miller noted that Petitioner's "Axis One

20   diagnosis is adult anti-social behavior," and it was "significantly improved."  Resp't's Answer

21   Ex. A, pt. 1, at 82; Parole Hr'g Tr. 38.  Petitioner had a Global Assessment of Functioning (GAF)

22   score of 90, where Petitioner had "good general functioning," and was "interested and involved

23   in bridal activities, socially connected, behaviorally and emotionally stable, [and] functioning

24   well with everyday problems and concerns."  Resp't's Answer Ex. A, pt. 1, at 82; Parole Hr'g Tr.

25   38.  Petitioner's assessment of dangerousness was "seen as significantly below average in

26   comparison with other inmates."  Resp't's Answer Ex. A, pt. 1, at 82; Parole Hr'g Tr. 38.  Dr.

Miller determined:

> The inmate has shown significant development and emotional
> maturity and control over his impulses through the years.  He has
> transformed himself from an immature self-referenced, impulsive
> anti-social youth into a mature, confident and self-controlled adult
> focused on helping others and leading a productive, non-violent
> life in the community.  He has shown initiative in advancing his
> work skills in several marketable areas of employment.  The
> support of his family will be an important resource to him in
> making a successful transition from incarceration to a productive
> citizen.

Resp't's Answer Ex. A, pt. 1, at 82-83; Parole Hr'g Tr. 38-39.

Dr. Miller expressed concern that the father of the two other children "may be a destabilizing influence for Theresa and his family," although Petitioner "voices no animosity for this man."  Resp't's Answer Ex. A, pt. 1, at 83; Parole Hr'g Tr. 39.  However, "it is uncertain whether the man continues to harbor anger towards the resigned inmate."  Resp't's Answer Ex. A, pt. 1, at 83; Parole Hr'g Tr. 39.  Petitioner's current wife wrote a letter, dated October 21, 2005, clarifying she does not "feel that there will be any problems out of the kid's father.  He has accepted the fact that we moved on with my life and it is no longer his.  So he is over that fact, and we have talked and he has come to terms with me and my husband living together."  Resp't's Answer Ex. A, pt. 1, at 83-84; Parole Hr'g Tr. 39-40.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one state court has adjudicated a petitioner's claims, a federal habeas court analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (finding presumption that later unexplained orders, upholding judgment or rejecting same claim, rests upon same ground as prior order)). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to, or an unreasonable application of, clearly established federal law. *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). When no state court reached the merits of a claim, the federal court must review that claim de novo. *See Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005), *cert. denied*, 547 U.S. 1128 (2006) (applying de novo standard of review to claim in habeas petition that was not adjudicated on merits by state court); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (same); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.").

///

V.  CLAIMS FOR REVIEW

The petition for writ of habeas corpus sets forth four grounds for relief, all of which are due process claims.  First, Petitioner argues that the Board erred because of "continued reliance on the commitment offense which will never change."  Pet'r's Pet. 6.  Second, Petitioner asserts he is entitled to parole because he served "beyond the maximum time contained in the matrix."  *Id.*  Third, Petitioner claims his due process rights were violated at the parole hearing.  *Id.*  Fourth, Petitioner alleges there is "no evidence of current risk."  *Id.*  For the following reasons, Petitioner's allegations lack merit.

A.  Legal Standard for Parole Denial

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

1.  Liberty Interest in Parole

A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979).  If a state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

parole release will be granted' when or unless certain designated findings are made," thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*, 442 U.S. at 12).

Section 3041 of the California Penal Code sets forth the state's legislative standards for determining parole for life-sentenced prisoners. Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate and shall normally set a parole release date . . . ." Subsection (b) provides an exception to the regular and early setting of a life-sentenced individual's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Based on this statute, California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

### 2. Scope of Due Process Protection

Additionally, as a matter of California state law, denial of parole to state inmates must be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002)). California's "some evidence" requirement is a component of the liberty interest created by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).

1   Thus, a reviewing court such as this one must "decide whether the California judicial decision

2   approving the . . . decision rejecting parole was an 'unreasonable application' of the California

3   'some evidence' requirement, or was 'based on an unreasonable determination of the facts in

4   light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

5          The analysis of whether some evidence supports the denial of parole to a California state

6   inmate is framed by the state's statutes and regulations governing parole suitability

7   determinations. *See Irons*, 505 F.3d at 851. A reviewing court "must look to California law to

8   determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then

9   must review the record to determine whether the state court decision holding that these findings

10  were supported by 'some evidence' [] constituted an unreasonable application of the 'some

11  evidence' principle." *Id*.

12                    3.  California's Parole Scheme

13         The "ISL," or "Indeterminate Sentence Law," "refers to sections of the Penal Code and

14  other Codes as they were operative prior to July 1, 1977." CAL. CODE REGS. tit. 15, §

15  2000(b)(59). Under the ISL, which was California's pre-1977 sentencing regime, "almost all

16  convicted felons received indeterminate terms, often with short minimums and life maximums.

17  Within this broad range, the parole authority was given virtually unbridled statutory power to

18  determine and redetermine, after the actual commencement of the imprisonment, what length of

19  time, if any, such person shall be imprisoned," and when to allow those prisoners to be released

20  on parole. *In re Dannenberg*, 34 Cal. 4th 1061, 1088, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005)

21  (internal quotation marks omitted). An "ISL Prisoner" is "[a] person sentenced to prison for a

22  crime committed on or before June 30, 1977, who would have been sentenced pursuant to Penal

23  Code section 1170 if he had committed the crime on or after July 1, 1977." CAL. CODE REGS. tit.

24  15, § 2000(b)(1); *cf.* CAL. PENAL CODE § 1170(a)(1) (declaring court should impose, with

25  specified discretion, "*determinate sentences* fixed by statute in proportion to the seriousness of

26  the offense as determined by the Legislature" (emphasis added)). Currently, parole consideration

18

1  criteria and guidelines for ISL prisoners are governed by title 15, sections 2315 *et seq.*, of the

2  California Code of Regulations.

3  In the 1970s, California replaced its ISL system with a determinate sentencing scheme.

4  The "DSL," or "Uniform Determinate Sentencing Act of 1976," "refers to sections of the Penal

5  Code and other Codes as they became operative July 1, 1977." CAL. CODE REGS. tit. 15, §

6  2000(b)(37).  A "DSL Prisoner" is "[a] person sentenced to prison pursuant to Penal Code

7  section 1170 for a crime committed on or after July 1, 1977." *Id.* § 2000(b)(2).  Under section

8  2000(b)(2), "once an ISL prisoner has received a retroactively calculated DSL release date[,] all

9  rules applying to DSL prisoners apply to the ISL prisoner's DSL release date and parole."

10  Here, in 1973, Petitioner "was convicted of first degree murder, four counts of robbery in

11  the first degree, assault with a deadly weapon with the intent to commit murder, and assault by

12  means of force likely to produce great bodily injury and with a deadly weapon, each with the

13  personal use of a firearm." *In re Hyde*, 154 Cal. App. 4th at 1202, 65 Cal. Rptr. 3d 162 (citations

14  omitted). "The trial court sentenced [Petitioner] pursuant to the *Indeterminate Sentencing Law* to

15  a term of life for the count 5 first degree murder." *Id.* (emphasis added).  Petitioner's "1973

16  convictions predate the enactment of the 1977 Determinate Sentencing Law." *Id.* at 1203 n.3, 65

17  Cal. Rptr. 3d 162.

18  Further, Petitioner never "received a retroactively calculated DSL release date." CAL.

19  CODE REGS. tit. 15, § 2000(b)(2).  The Board and the Court of Appeal both acknowledged

20  "[Petitioner's] minimum parole date was January 13, 1980." *In re Hyde*, 154 Cal. App. 4th at

21  1204, 65 Cal. Rptr. 3d 162; *see* Resp't's Answer Ex. A, pt. 1, at 45; Parole Hr'g Tr. 1.  Section

22  2000(b)(2), which provides that "all rules applying to DSL prisoners" apply to ISL prisoners who

23  "received a retroactively calculated DSL release date," is irrelevant here.

24  Rather than applying sections 2315 *et seq.*, for ISL prisoners, the Board, Superior Court,

25  and Court of Appeal considered parole suitability and unsuitability factors for "life prisoners"

26  under title 15, section 2281 of the California Code of Regulations.  *In re Hyde*, 154 Cal. App. 4th

at 1210-11, 65 Cal. Rptr. 3d 162 (Court of Appeal); Resp't's Answer Ex. A, pt. 2, at 140 (Superior Court); Resp't's Answer Ex. A, pt. 1, at 49; Parole Hr'g Tr. 5 (Board).  A "Life Prisoner" is "[a] prisoner serving a sentence of life with the possibility of parole."  CAL. CODE REGS. tit. 15, § 2000(b)(3).  The "Life Prisoner" definition lists crimes for which "[l]ife sentences may be imposed," *id.*, including (A) "[f]irst degree murder (Penal Code section 187);" and (B) "[s]econd degree murder (Penal Code section 187) *committed on or after November 8, 1978.*"  *Id.* § 2000(b)(3)(A)-(B) (emphasis added).  Since a "Life Prisoner" includes prisoners convicted of first degree murder with no time constrictions, Petitioner, who was convicted of first degree murder, is a "Life Prisoner" under a strict interpretation of section 2000(b)(3)(A).  Parole guidelines for life prisoners under section 2281 appear to apply here.

But, new DSL regulations amended section 2281(c) (listing circumstances tending to show unsuitability), meaning section 2281 applies to DSL, not ISL, prisoners.  *See* Cal. Admin. Reg. 79, No. 26 (June 28, 1979); *see also In re Duarte*, 143 Cal. App. 3d 943, 948-49, 193 Cal. Rptr. 176 (1983); *In re Seabock*, 140 Cal. App. 3d at 38-39, 189 Cal. Rptr. 310 (1983).  Sections 2315 *et seq.*, for ISL prisoners, rather than section 2281 under the new DSL regulations, should apply here because Petitioner's "1973 convictions predate the enactment of the 1977 Determinate Sentencing Law."  *See In re Hyde*, 154 Cal. App. 4th at 1203 n.3, 65 Cal. Rptr. 3d 162.  However, in *Connor v. Estelle*, the Ninth Circuit held that applying DSL, rather than ISL, suitability criteria does not violate due process because "ISL and DSL guidelines apply identical criteria in determining parole suitability."  981 F.2d 1032, 1034-35 (9th Cir. 1992) (citing *In re Duarte*, 143 Cal. App. 3d at 951, 193 Cal. Rptr. 176 (1983)).  For consistency purposes, section 2281 is the legal standard recited here.

Title 15, section 2281 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for life prisoners.  "All relevant, reliable information available to the [Board] shall be considered in determining suitability for parole."  CAL. CODE REGS. tit. 15, § 2281(b).  This includes:

> [T]he circumstances of the prisoner's:  social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

*Id.*  The regulation also lists specific circumstances which tend to show suitability or unsuitability for parole.  *Id.* § 2281(c)-(d).

Under section 2281(c)(1), factors relating to a commitment offense tend to show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense.  *Id.* § 2281(c)(1)(A)-(E).

Other circumstances tending to indicate unsuitability include:

> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

> (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2281(c)(2)-(6).

Section 2281(d) sets forth circumstances tending to show suitability, which include:

21

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2281(d)(1)-(9).

The overriding concern is public safety and the focus is on the inmate's *current*

dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus,

the proper articulation of the standard of review is not whether some evidence supports the stated

reasons for denying parole, but whether some evidence indicates that the inmate's release would

unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th

1   at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

2       B.  State Court Decision

3       Here, because the California Supreme Court summarily denied the petition, the state court

4   decision appropriate for review is the California Court of Appeal's decision.  Under AEDPA's

5   standards, the Court of Appeal properly held that "some evidence" showed Petitioner "presents

6   an unreasonable risk of danger to the public."  *In re Hyde*, 154 Cal. App. 4th at 1217, 65 Cal.

7   Rptr. 3d 162.

8          1.  Grounds One, Three and Four:  Due Process and Some Evidence

9       In Grounds One, Three, and Four, Petitioner claims "[t]here is no evidence to support

10   [p]arole [d]enial and no nexus between the reasons stated for parole denial and Petitioner's

11   current level of dangerousness to the community if released at this time."  Pet'r's Pet. 11

12   (internal quotation marks omitted).  Petitioner also argues that "[c]ontinued reliance on the

13   Commitment Offense . . . violat[es] Due Process at the Parole Consideration Hearing."  *Id.* at 16.

14       "[T]he fundamental consideration in parole decisions is public safety," *In re Lawrence*,

15   44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535, not whether Petitioner's commitment

16   offense alone can be sufficient to deny parole.  *See In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal.

17   Rptr. 3d 213, 190 P.3d 573.  "[T]he aggravated nature of a commitment offense does not, in

18   every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the

19   egregiousness of the commitment offense to the exclusion of other relevant evidence has proved

20   in practice to obscure the core statutory emphasis upon *current* dangerousness . . . ."  *Id.* (citing

21   *In re Lawrence*, 44 Cal. 4th at 1213, 82 Cal. Rptr. 3d 169, 190 P.3d 535).  The Board may have

22   improperly based its parole denial on the commitment offense rather than risk of public safety

23   when it stated, "All our weight went on the crime."  Resp't's Answer Ex. A, pt. 1, at 54; Parole

24   Hr'g Tr. 10.

25       The Court of Appeal subsequently reviewed the record to add that Petitioner's 1990

26   conviction, combined with the commitment offenses, constituted "some evidence" demonstrating

current dangerousness.  *See In re Hyde*, 154 Cal. App. 4th at 1216-18, 65 Cal. Rptr. 3d 162.  At first blush, the Court of Appeal seemed to deny habeas relief based on Petitioner's commitment offenses, since the Court of Appeal held that Petitioner's "commitment offenses constitute a reliable indicator that [Petitioner] presents an unreasonable risk of danger to the public." *Id.* at 1217, 65 Cal. Rptr. 3d 162.  Importantly, however, the Court of Appeal determined the Superior Court erred because "it failed to consider [Petitioner's] 1990 conviction," which "renders the 1973 offenses considerably more probative in supporting a conclusion of an unreasonable risk of danger to society." *Id.* at 1216-17, 65 Cal. Rptr. 3d 162.

As stated earlier, on September 4, 1989, Petitioner received a 115 violation for possessing a 15.5 inch inmate manufactured weapon made of aluminum and sharpened on one end.  Resp't's Answer Ex. A, pt. 1, at 60-61; Parole Hr'g Tr. 16-17.  On March 2, 1990, Petitioner was "found guilty" at the institutional level.  Resp't's Answer Ex. A, pt. 1, at 61; Parole Hr'g Tr. 17.  Under the California parole regulations, Petitioner was disciplinary free for over fourteen years at his 2005 parole hearing, since he received his last 115 violation in 1991.  Cal. Code Regs. tit. 15, § 3000 ("Disciplinary Free means without any finding of guilt of a disciplinary infraction filed on a CDC Form 115, Rule Violation Report, classified as either administrative or serious.").  The issue, therefore, is whether the Court of Appeal reasonably determined that Petitioner's 1990 conviction, combined with his commitment offenses, constituted "some evidence" of Petitioner's current dangerousness at the time of the hearing.  *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." (citing *Williams*, 529 U.S. at 410)).

Generally, courts determine a petitioner is not currently dangerous where, *inter alia*:  (1) the petitioner's latest prison disciplinary infraction was non-violent; and (2) any serious infraction usually occurred about a decade prior to the parole hearing.  *See*, *e.g.*, *Cooke*, 606 F.3d at 1215 (granting habeas relief where petitioner had two "minor and non-violent" disciplinary

violations, one where petitioner refused to "clean up another's [sic] man's feces," and another where petitioner refused "to take food off another man's tray," nearly ten years prior to parole hearing); *Hinkles v. Vaughn*, No. CV 05-0024-ODW (JEM), 2009 WL 6312276, at *18-19 (C.D. Cal. Dec. 4, 2009) (granting habeas relief where:  (1) petitioner "had not exhibited violent behavior in prison;" (2) latest 115 violation was fourteen years old for possession of marijuana; and (3) latest 128 violation was seven years old for "battery on an inmate," but petitioner was "the victim"); *Pacheco v. Davison*, No. CV 08-3019-SJO (JEM), 2009 WL 3122533, at *4, *12, *14 (C.D. Cal. Sept. 25, 2009) (granting habeas relief where Board's parole denial was based on Petitioner's commitment offense and non-violent disciplinary history, and last 115 violation occurred more than eleven years prior to hearing, where "prison officials found drugs and a syringe in her cell," which petitioner attributed to cell mate and "tested negative for cocaine"); *Branham v. Davison*, No. EDCV 06-1294-ODW (OP), 2009 WL 3055404, at *10, *18 (C.D. Cal. Sept. 22, 2009) (granting habeas relief where petitioner "had no prison disciplinary actions other than a 128 in 2005[,] [the same year as her parole hearing,] which she received because photographs that were displayed in her cell did not conform to housing unit rules"); *Styre v. Adams*, No. 1:07-CV-01436-WWS (HC), 635 F. Supp. 2d 1166, 1167, 1170 (E.D. Cal. 2009) (granting habeas relief where petitioner received "three citations for non-violent disciplinary infractions early in his prison term, but has remained discipline free" for about nine years since parole board hearing at issue); *Hoffman v. Marshall*, No. CV 08-1427-R (RNB), 2009 WL 585437, at *11, *15 (C.D. Cal. Mar. 5, 2009) (granting habeas relief where petitioner "has not had a serious violation since the year he was admitted to state prison in 1977," and his "last minor violation" for "disrespecting staff" occurred fifteen years prior to parole haring at issue, but "those things [128s] kind of happen" (internal quotation marks omitted)), *aff'd*, 362 Fed. Appx. 667, 667-68 (9th Cir. 2010) ("The Board subsequently determined that [the petitioner] was suitable for parole, the Governor declined to exercise his discretion to review the decision, and [the petitioner] has now been released on parole.  Therefore, this appeal is moot."); *Tripp v. Cate*,

25

No. C 07-05748 CW, 2009 WL 248368, at *2, *12 (C.D. Cal. Feb. 2, 2009) (granting habeas relief where petitioner's (1) last 115 violation was for "failure to report to a work assignment" about fourteen years prior to parole hearing at issue; and (2) last 128 violation was for "excessive clothing" about three years prior to parole hearing).

Where a petitioner's latest prison disciplinary infraction involves violence, which is logically a better indicator of current dangerousness, courts have diverged as to whether the petitioner's release would endanger public safety.  In *Chambers v. Sullivan*, the district court found parole denial was proper where the Board relied on the commitment offense and a disciplinary infraction involving a "violent altercation" from over fifteen years ago.  No. 1:08-CV-00187 OWW JMD HC*,* 2009 WL 1439716, at *3, *6-7 (E.D. Cal. May 21, 2009).  In contrast, courts have granted habeas relief where they determined the petitioner's latest serious disciplinary violation, albeit violent, did not indicate petitioner's current dangerousness.  *See*, *e.g.*, *Liebb v. Ayers*, No. C 08-02643 CW, 2009 WL 4724238, at *2, *8, *11 (N.D. Cal. Dec. 2, 2009) (granting habeas relief where district court determined Board's parole denial was only based on commitment offense, not eighteen-year old 115 violation "for fighting with another inmate"); *La Cava v. Marshall*, No. CV 05-8729-AG (OP), 2009 WL 2431592, at *1, *12 (C.D. Cal. July 31, 2009) ("[T]he Court finds that this 1993 incident, [an assault on another inmate,] even in conjunction with the 1981 murder, does not support the conclusion that Petitioner *currently* poses a risk of danger to the public if released[,]" where 1993 incident occurred about nine years prior to parole hearing); *Cowans v. Marshall*, No. CV 05-6276-RSWL (OP), 2009 WL 2824579, at *3, *16 (C.D. Cal. Aug. 25, 2009) (granting habeas relief where:  (1) petitioner's "last 115 was in 1990 for fighting," eleven years prior to 2001 parole hearing; and (2) petitioner had no 128s since 1991), *aff'd* 2010 WL 2931132, at *1 (9th Cir. July 22, 2010); *Milot v. Haws*, 628 F. Supp. 2d 1152, 1170 (C.D. Cal. 2009) (granting habeas relief where:  (1) only one 115 violation "involved . . . violence, while one other involved the attempted use of force;" (2) petitioner's remaining violations were "non-violent;" and (3) petitioner was "clear of serious

violations for nearly 20 years and non-serious incidents for nearly 10 years”).

The instant case is distinguishable from the earlier cited cases where habeas relief was granted for petitioners without violent disciplinary infractions.  Petitioner's possession of a 15.5 inch “dirk or dagger” is more similar to a violent disciplinary infraction than a non-violent one. *In re Hyde*, 154 Cal. App. 4th at 1205, 65 Cal. Rptr. 3d 162 (“In 1990 [Petitioner] suffered a felony conviction for possessing a *dangerous* weapon, a dirk or dagger ([California Penal Code] § 12020, subd. (a)) . . . .” (emphasis added)); *see generally People v. Hayes*, 171 Cal. App. 4th 549, 552 n.2, 89 Cal. Rptr. 3d 821 (2009) (acknowledging officer's testimony that “inmates develop weapons for the purpose of attack or self-defense”); *People v. Martinez*, 67 Cal. App. 4th 905, 912, 79 Cal. Rptr. 2d 334 (1998) (affirming inmate's conviction for possession of a deadly weapon, to wit, “a ‘Swiss Army knife-type knife,’ a nail clipper with attachments, and a Bic cigarette lighter” because, *inter alia*, “[t]he unauthorized possession of a potentially dangerous instrument, alone, is sufficient to create the security risk”); *People v. Rodriquez*, 50 Cal. App. 3d 389, 393, 123 Cal. Rptr. 185 (1975) (“Weapons similar to the razor blade/toothbrush found in [inmate's] cell are commonly used in jail fights.  They can inflict serious injury.  Prosecution witnesses testified such items are primarily used, if not solely used, as weapons.  These weapons can inflict neck wounds, causing profuse bleeding, which could result in death if not immediately treated.”).

However, it is unnecessary to resolve the divergence between habeas grants and denials among petitioners with violent, serious disciplinary violations, nor even among petitioners with serious disciplinary violations versus petitioners with only minor infractions.  California law does not require the Board to conduct a comparative analysis of the period of confinement served by other prisoners with similar crimes.  *See In re Dannenberg*, 34 Cal. 4th at 1084, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (holding Board does not have to schedule inmate's release “simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes”); *see also id.* at 1091 (finding California regulations “nowhere indicate that the Board

1  must determine an individual inmate's suitability by reference to other offenders of the same

2  class, or to the minimum statutory term for the inmate's offense").

3        Instead, the Board must review the specific facts of each case to make an individualized

4  determination of whether that prisoner is suitable for parole.  *See In re Lawrence*, 44 Cal. 4th at

5  1221, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Additionally, federal courts "cannot re-weigh the

6  factors supporting parole suitability and the factors supporting parole unsuitability."  *See Powell*

7  *v. Gomez*, 33 F.3d 39, 42 (9th Cir. 1994) ("This court cannot reweigh the evidence, but looks

8  only [for] 'some evidence' . . . ."); *In re Shaputis*, 44 Cal. 4th at 1260-61, 82 Cal. Rptr. 3d 213,

9  190 P.3d 573 (noting although it might be reasonable to conclude that petitioner's many years of

10  sobriety, advanced age and health problems suggested he would never again consume alcohol

11  and engage in criminal conduct, court cannot reweigh evidence as long as record shows "*due*

12  *consideration of the specified factors* as applied to the individual prisoner in accordance with

13  applicable legal standards").

14        Here, the Board may consider Petitioner's 1990 conviction under title 15, section

15  2281(c)(6) of the California Code of Regulations, which labels serious misconduct by a prisoner

16  while incarcerated as a circumstance tending to show unsuitability.  Section 2281(c)(6) does not

17  set a limit on how long a serious misconduct may be considered as an unsuitability factor.

18  Although past misbehavior may become irrelevant to parole suitability after a certain period of

19  time, no case or statute definitively provides when a serious, violent disciplinary violation should

20  no longer be considered.  *See supra* pp. 24-27.  Accordingly, the Court of Appeal was not

21  unreasonable for determining that the 1990 conviction, combined with the commitment offenses,

22  was probative of current dangerousness.  *See Schriro*, 550 U.S. at 473; *cf. Chambers*, 2009 WL

23  1439716, at *3 (denying habeas relief where last violent disciplinary infraction occurred over

24  fifteen years ago).

25        Notably, the "some evidence" standard is minimal, and is meant only to "assure[] that

26  'the record is not so devoid of evidence that the findings of the disciplinary board were without

support or otherwise arbitrary.'" *Sass*, 461 F.3d at 1129 (quoting *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 457 (1984)).  The egregious nature of the commitment offenses and Petitioner's prison disciplinary record constitute sufficient evidence to meet this minimal standard of judicial review.  Consequently, Petitioner's due process rights were not violated, and he is not entitled to federal habeas relief.

2.  Grounds Two and Three:  Due Process and Matrix Argument

In Ground Three, Petitioner argues that his imprisonment "exceed[s] the maximum time contained in the matrix utilized in setting the term of imprisonment and violate[s] Due Process . . . ."  Pet'r's Pet. 16.  California parole guidelines require setting a "base term for each life prisoner who is found suitable for parole."  CAL. CODE REGS. tit. 15, § 2282(a).  The "base term" is "established by utilizing the appropriate matrix of base terms" provided in title 15, section 2282 of the California Code of Regulations.  *Id.*

a.  Exhaustion

Respondent contends that Petitioner failed to exhaust his due process and matrix argument.  Respondent admits Petitioner "exhausted his state court remedies regarding the claim that the Board's 2005 decision violated his due process rights on the ground that the decision was not supported by the evidence."  Resp't's Answer 4.  Respondent then denies in a lone sentence that Petitioner "exhausted his claims to the extent they are interpreted more broadly to encompass any systematic issues beyond this claim."  *Id.*  Since Petitioner argues his due process rights were also violated because his imprisonment "exceed[s] the maximum time contained in the matrix," Pet'r's Pet. 16, Respondent implies that Petitioner failed to exhaust this claim.  *See Rose v. Lundy*, 455 U.S. 509, 522 (1982) ("[W]e hold that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims.").

Even if Petitioner's claim was unexhausted, an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust available state remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny

29

an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."

*Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  Here, it is recommended that federal

habeas relief be denied on the merits of Petitioner's matrix claim.

b.  Merits of Due Process and Matrix Argument

To the extent Petitioner contends the Board violated state law or regulations, Petitioner is

not entitled to habeas relief.  A federal court may grant habeas corpus relief "only on the ground

that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United

States."  28 U.S.C. § 2254(a).  Mere errors in the application of state law are not cognizable on

habeas corpus.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see generally Langford v. Day*,

110 F.3d 1380, 1389 (9th Cir. 1996) (explaining federal petitioner may not "transform a state-law

issue into a federal one merely by asserting a violation of due process"), *cert. denied*, 522 U.S.

881 (1997).

In any event, Petitioner's claim lacks merit under state law.  Under California law, the

Board is not required to fix a base term until it finds an inmate suitable for parole.  CAL. CODE

REGS. tit. 15, § 2282(a); *see Irons v. Carey*, 505 F.3d 846, 851 n.3 (9th Cir. 2007) ("A

'determination of an individual inmate's suitability for parole under section 3041, subdivision (b)

[of the California Penal Code] must precede any effort to set a parole release date under the

uniform-term principles of section 3041, subdivision (a).'" (quoting *In re Dannenberg*, 34 Cal.

4th at 1079-80, 23 Cal. Rptr. 3d 417, 104 P.3d 783)); *In re Stanworth*, 33 Cal. 3d 176, 183, 654

P.2d 1311 (1982) ("Under both the 1976 and the current rules, a life prisoner must first be found

suitable for parole before a parole date is set."); *see also* CAL. PENAL CODE § 3041(b) (The

Board "shall set a release date unless it determines that the gravity of the current convicted

offense or offenses, or the timing and gravity of current past convicted offense or offenses, is

such that consideration of the public safety requires a more lengthy period of incarceration for

this individual, and that a parole date, therefore, cannot be fixed at this meeting.").  Petitioner

was not found suitable for parole; the matrix did not need to be consulted.  Additionally,

1  Petitioner's claim that there was no evidence to deny him parole is unavailing.  *See supra* Part

2  V.B.1.  Accordingly, Petitioner's claim is without merit.

3                                        VI.  CONCLUSION

4          For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

5  application for writ of habeas corpus be DENIED.

6          These findings and recommendations are submitted to the United States District Judge

7  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

8  days after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within seven days after service of the objections.  Failure to file

12  objections within the specified time may waive the right to appeal the District Court's order.

13  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

14  (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

15  appealability should be issued in the event he elects to file an appeal from the judgment in this

16  case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

17  deny certificate of appealability when it enters final order adverse to applicant).

18  DATED:          October 25, 2010.

19

20

21                                        TIMOTHY J BOMMER
                                          UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26